

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Criminal No. 3:19-cr-00178 |
| ) | |
| v. ) | Conspiracy to Commit Wire Fraud |
| ) | 18 U.S.C. § 1349 |
| ) | |
| STUART JAY ANDERSON, ) | Criminal Forfeiture Allegation |
| ) | 18 U.S.C. §§ 981 & 982 |
| Defendant. ) | |

## CRIMINAL INFORMATION

THE UNITED STATES CHARGES THAT:

## INTRODUCTORY ALLEGATIONS

At all times relevant to this Criminal Information:

### The Defendant, His Co-conspirators, and Related Entities

1. Defendant STUART JAY ANDERSON was a resident of California and an attorney practicing in that state.

2. Brian Michael Bridge was a principal in various companies based in the United Kingdom, including Chimera Group, Ltd. (Chimera) and Ion International Holdings (Ion). Ion's website described Chimera as a wholly owned subsidiary of Ion, and Ion held itself out to be a Hong Kong-based corporation established in 2015. The website further described the companies as a continuation of a 10-year-old fund wholly owned and operated by Bridge, which held more than $5 billion diversified across various asset classes. The website described Bridge as having more than 15 years of successful experience in structuring, underwriting, and trading collateralized securities. Bridge solicited funds in his individual capacity and through these entities.

3. James Michael Johnson previously was a financial planner and investment advisor who lived and worked in the Richmond, Virginia metropolitan area. Johnson solicited funds as part of this conspiracy in his individual capacity and through two businesses—1st Street Marketing and Consulting, LLC, and Paladin Consulting LLC. At various times throughout the pendency of the conspiracy, Johnson also held positions with Chimera and Ion.

4. James Leonard Smith, a resident of the Richmond, Virginia metropolitan area, solicited funds in his individual capacity and through a business called Pallas Agency, LLC. At various times throughout the pendency of the conspiracy, Smith also held positions with Chimera and Ion.

## Advance Fee Schemes

5. Advance fee schemes typically involve promoters who promise to pay victims a sum of money at a later date in exchange for an upfront advanced payment. The object of such schemes is to entice individuals and businesses into sending money in the hopes of receiving large payouts that will solve their financial problems. The victim individuals and companies often, but not always, are not able to raise money through conventional financing.

6. Advance fee scheme promoters will often use fabricated bank documents in order to induce victims into sending them large sums of money. In one variety of an advance fee scheme, a fraudulent standby letter of credit ("SBLC") is offered to victim individuals and businesses as a means of obtaining large sums of money in exchange for the transfer of up-front funds to scheme participants. Scheme participants typically promise clients that they will receive hundreds of thousands or millions of dollars in exchange for the deposit of a fraction of that amount. In another variety of an advance fee scheme, scheme promoters will offer a fraudulent

2

blocked funds letter ("BFL") to victim individuals and businesses as a means of obtaining large sums of money from them. The BFL generally states that an amount of money equal to the amount of money sought from the victim has been set aside—or "blocked"—in a bank account, giving victims the false assurance that their principal payment is being protected. In both of these varieties of an advance fee scheme, the letters are often printed on the letterhead of a large, reputable international financial institution, and the letters appear to be official documents from that institution. However, the letters are fabricated and are not actually issued by the financial institution.

7. Advance fee schemes often make use of "escrow agents," many of whom are licensed attorneys. The scheme participants tell victims that the escrow agent will hold their money in escrow, thereby giving victims further false assurance that their money is being protected. However, the escrow agents are themselves scheme participants, and they usually immediately disburse the victims' funds to themselves and the other scheme participants.

8. However, scheme participants have no intention to obtain the funds for the individuals and businesses whom they solicit to participate in the advance fee schemes. Money sent to scheme participants, including to purported escrow agents, is typically stolen shortly after it is transferred to them.

## CONSPIRACY TO COMMIT WIRE FRAUD

1. The Introductory Allegations are incorporated by reference as if fully set forth here.

2. Beginning prior to on or about July 1, 2014, and continuing through on or about March 27, 2019, the exact dates being unknown to the Grand Jury, in the Eastern District of

3

Virginia and within the jurisdiction of this Court, as well as elsewhere, defendant STUART JAY ANDERSON, did unlawfully and knowingly conspire with Brian Michael Bridge, James Michael Johnson, and James Leonard Smith, as well as others known and unknown to the United States, to commit offenses contained within Chapter 63 of Title 18 of the United States Code, that is: to knowingly execute and attempt to execute a scheme and artifice to defraud and to obtain property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud transmitted and caused transmission of writings, signs, and signals in interstate and foreign commerce, in violation of Title 18, United States Code, Section 1343.

## Object of the Conspiracy and Scheme and Artifice to Defraud

The objects of the scheme were for the members of the scheme to (a) unlawfully enrich themselves by obtaining funds from individuals and businesses through an advance fee scheme, in particular, by knowingly offering materially fraudulent SBLCs and BFLs to individuals and businesses with associated fraudulent escrow services, and diverting those funds to themselves; and (b) conceal from investors the manner in which the co-conspirators were using the stolen investor proceeds.

## Ways, Manners, and Means of the Conspiracy and Scheme and Artifice to Defraud

The ways, manners, and means of the conspiracy and scheme and artifice to defraud included, but were not limited to the following:

1. Bridge, Johnson, and Smith approached individuals in search of high-yield investments and start-up businesses in search of capital. Bridge, Johnson, and Smith offered

4

individuals the prospect of a high-interest-rate loan to Chimera or Ion. They offered the start-up businesses the prospect of securing capital from Chimera or Ion.

2. When dealing with the start-up businesses, Bridge, Johnson, and Smith advised the businesses to temporarily loan money to Chimera or Ion at a high interest rate to prove their own creditworthiness and establish that they would not be completely reliant on Chimera or Ion for capital. They further advised that upon the loans' maturity, the businesses would receive the capital they sought. To create the impression that these loans were preludes to more substantial capital investments in the businesses, Bridge, Johnson, and Smith also provided the businesses with agreements under which Chimera or Ion would receive an ownership interest in the businesses in return for providing the capital.

3. The representations conspirators made to individuals and businesses varied over time, but typically Bridge, Johnson, and Smith guaranteed that funds loaned to Chimera and Ion were secured by purported bank accounts at Financial Institution A, a Spanish bank and financial services conglomerate. To this end, they provided investors with forged BFLs purportedly from Financial Institution A. These BFLs falsely represented that Chimera or Ion had funds equalling the amount of the loan reserved in a bank account. In some instances, these fraudulent documents were drafted by Smith.

4. Bridge, Johnson, and Smith also provided assurances to individuals and businesses by using attorneys' escrow accounts, including that of ANDERSON, for the collection and disbursement of investor funds. In support of those assurances, Bridge, Johnson, and Smith provided term sheets to investors, which read, in part, that if Chimera failed to issue an SBLC or BFL within 48 banking hours of the investor providing the deposit, then "Chimera

5

shall cause the Escrow Agent to reimburse the Deposit amount, in full, and all interest payable thereon, back to" the investor's bank account. However, in almost every situation, the money provided by the investor was immediately sent out of the escrow account by ANDERSON to Bridge, Johnson, and Smith, and other entities and individuals associated with the scheme.

5. Once collected, ANDERSON disbursed the funds from his escrow account to himself, Bridge, Johnson, and Smith, and other co-conspirators who converted the funds to their own use. On occasion, an individual or business received a nominal interest payment on their loan. The conspirators usually made these payments when the maturity date on a loan was close and they intended to ask the individual or business to roll over or renew the loan for an additional period. ANDERSON often disbursed these nominal interest payments from his escrow account via wire transfers.

6. The maturity dates for all loans or renewals passed, after which no individual or business received any additional interest payments or return of principal. Furthermore, no business ever received the promised capital investment.

7. Among the individuals from whom the defendants solicited funds was J.H., a resident Hanover County, Virginia, who runs an electrical contracting business based in Mechanicsville, Virginia. In February 2016, Johnson approached J.H. about the opportunity to invest in Chimera, and eventually introduced him to Smith.

8. On or about February 12, 2016, Smith, representing himself as Ion's managing director, sent J.H. an email that set forth the following terms for a potential loan to Chimera: (a) the loan term would be 4 months; (b) interest and principal would be paid out at the end of each loan; (c) the minimum loan amount was $100,000; and (d) the annual interest rate on the loan

6

(assuming roll-over at the end of each four month period) would be 12 percent (1 percent per month). Smith also represented that the borrowers would "be providing dollar for dollar cash collateral to secure the lender's principle [sic]" and that "[a]ll information will be verified bank-to-bank." Smith provided J.H. with a link to the purported website for one of Chimera's projects, *http://www.arquimedes.com.co*.

9. J.H. agreed to loan Chimera $100,000 consistent with the terms set forth in Smith's email. Also acting at Johnson's direction, J.H. executed a document dated April 5, 2016 entitled "Short Term Loan Agreement" (STLA). Bridge, acting on behalf of Chimera, signed this document as well. The terms of the agreement were consistent with Smith's February 12, 2016 email. Accompanying the agreement was a fraudulent BFL from Financial Institution A, asserting that it was holding the sum of $100,000 as collateral for the life of J.H.'s loan. That letter was purportedly signed by two individuals who were falsely impersonating employees of Financial Institution A.

10. J.H. wrote a check dated April 5, 2016 payable to "Stuart Anderson Attorney at Law—IOLTA" in the amount of $100,000 and gave it to Johnson. The $100,000 check was deposited into Anderson's escrow account on April 6, 2016.

11. Following the deposit of the $100,000 from J.H., a series of emails passed between Smith and one of the individuals (Co-Conspirator 1) impersonating an employee of Financial Institution A in the BFL. On April 13, 2016, Co-Conspirator 1 sent Anderson an email from the email address [Co-Conspirator1]@[Financial Institution A] (which was not a legitimate Financial Institution A email address) relating that he was sending a copy of a BFL "at the request of our client," [J.H.]. Later that day, Co-Conspirator 1 then forwarded the same email to

a private email address, [Co-Conspirator 1]74@gmail.com. In these emails, Smith and Co-Conspirator 1 collaborated on the re-drafting of the BFL, which contained certain mistakes about the maturity date on J.H.'s loan. Once the corrections were made, Co-Conspirator 1 sent Smith a $30,000 invoice for his assistance with re-drafting the BFL, requesting that the funds be wired to an account with a bank in Cyprus. Smith replied to Co-Conspirator 1 that "[a]s soon as [the bank where Anderson's escrow account was held] opens in [California, Anderson] will take care of your invoice." Smith sent the corrected BFL to ANDERSON in an email chain dated April 13, 2016, and that chain included correspondence with Co-Conspirator 1—purportedly acting in his capacity as a Financial Institution A employee—at the personal email address [Co-Conspirator 1]74@gmail.com.

12. During the six days following the deposit of J.H.'s funds into ANDERSON's escrow account, ANDERSON caused the following disbursements:

- an approximately $26,000 international wire to a private school located in the United Kingdom;
- an approximately $30,000 wire out to an bank account in Cyprus referencing a "Chimera contract fee";
- an approximately $8,000 international wire to an unknown bank account in Latvia also referencing "Chimera contract fee";
- an approximately $5,000 wire to 1st Street Marketing and Consulting;
- an approximately $2,000 check paid to ANDERSON for "Fee Chimera-Hill"; and
- an approximately $26,500 wire to Pallas Agency, LLC.

13. On or about July 5, 2016, J.H. received an interest payment of approximately $4,000 from Chimera via wire from the ANDERSON escrow account into J.H.'s personal bank account. Shortly thereafter, J.H., acting at Johnson's suggestion, rolled over his initial $100,000 loan, and entered into another four-month STLA dated July 6, 2016.

14. On or about November 8, 2016, J.H. entered into a third STLA with Chimera on the same terms as the previous two agreements, again rolling over the $100,000 principal initially lent. On or about November 15, 2016, J.H. received another interest payment of $5,000 from Chimera via wire from the ANDERSON escrow account into J.H.'s personal M&T Bank account.

15. Also among the victims from whom the defendants solicited funds was Company A, a non-profit volunteer fire-fighting company located in Exmore, Virginia. T.L. and P.L., husband and wife, were respectively the President and Treasurer of Company A. T.L. and P.L. engaged Johnson as financial advisor to the organization.

16. During the summer of 2016, Johnson approached P.L. and T.L. about a proposed loan to Chimera. Johnson advised that a loan of $100,000 to Chimera would yield a return of 6% per quarter. Johnson stated that the funds would be going to an attorney in California and then eventually to a bank overseas. Johnson further guaranteed Company A would receive payment of earned interest and return of principal (if requested) on a quarterly basis.

17. Thereafter, Company A issued a check payable to ANDERSON for $100,000, which was deposited into ANDERSON's escrow account on or about June 7, 2016.

18. Between on or about June 7 and 13, 2016, ANDERSON caused the disbursement of Company A's funds from his escrow account. These disbursements included:

9

- approximately $63,600 to the Pallas Agency;
- approximately $5,000 to 1st Marketing & Consulting;
- an approximately $9,880 international wire to relative of Bridge in the United Kingdom;
- an approximately $13,000 international wire to an account in Mexico with reference to "Chimera/Brian Bridge payment"; and
- approximately $5,000 to ANDERSON.

19. Around the time Company A provided Johnson with the funds, Johnson provided Company A with a fraudulent Financial Institution A BFL dated June 10, 2016 falsely stating that Financial Institution A was holding $100,000 in a Chimera account as a guarantee for Company A's loan. In fact, Financial Institution A never issued the BFL and the Chimera account referenced in the BFL did not exist.

20. On or about November 15, 2016, Company A received a total interest payment of $10,000, wired by ANDERSON to Company A's bank account in two $5,000 increments. Thereafter, Company A agreed to rollover the principal investment for an additional four-month term.

21. In or about February 2017, Company A advised Johnson that it wanted its principal on the Chimera loan returned to it along with the next interest payment, scheduled for February 13, 2017. On or about February 13, 2017, Smith sent an email to Bridge and ANDERSON (with Johnson and P.L. copied) requesting that Company A receive the scheduled interest payment and return of the principal lent.

10

22. On or about February 13, 2017, Bridge responded to Smith's email, stating in part:

> Thanks for sending out this e-mail and also Mj [JOHNSON] thanks for updating your guys personally. Just to confirm that the said funds will be there next week, as I will be finishing off what I am doing there, please note for a bonus for all who wait till next week I will pay a further 10K for the weeks wait. Thanks for the patience and I am sorry but I need a week to finish off what I have to do in China and all the funds will be sent to manage all closings. Regards, B. Michael Bridge.

23. As of approximately March 6, 2017, Company A had not received the scheduled interest payment or return of its principal. On that day, P.L. sent Bridge, Johnson, Smith, and ANDERSON an email again requesting the scheduled interest payment and return of the principal lent. P.L. also stated that if Company A had not received these funds by March 16, 2017, it would contact its attorney.

24. On or about March 8, 2017, Johnson replied to P.L.'s email as follows:

> I wanted to follow up on the e-mail that you received from Michael Bridge. The attached article addresses the process that Michael is dealing with in China. Michael is the only person that can repay your money. He has promised to pay [Company A] and [Financial Institution A] has guaranteed your money. We are simply late due to the process mentioned in the article. You will be paid. Michael has been in China for three months. He expected to be finished with his visit in January. I am so sorry that the delay in China that Michael has experienced has inconvenienced you. He has promised me that he will honor his commitment to you. Sometimes delays happen----I assure you it was not intentional.

25. To date, Company A has not received the additional promised interest payments or return of its principal.

26. As a result of this scheme to defraud, conspirators obtained at least approximately $6.2 million in funds to which they were not entitled.

(All in violation of Title 18, United States Code, Section 1349.)

## CRIMINAL FORFEITURE ALLEGATION

Pursuant to Rule 32.2(a) FED. R. CRIM. P., the defendant is notified that, if convicted of the offense alleged in this Criminal Information, he shall forfeit to the United States any property constituting, or derived from, proceeds obtained directly or indirectly as the result of such violations, including, but not limited to, any assets which may be directly forfeitable as proceeds or subject to forfeiture as a substitute asset. Property subject to forfeiture includes, but is not limited to, a money judgment in the amount of at least $349,588.46.

(In accordance with Title 18, United States Code, Section 981(a)(1)(C), as incorporated by 28 U.S.C. § 2461(c).)

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By: _____
Michael C. Moore
Assistant United States Attorney

ROBERT ZINK
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

_____
Vasanth Sridharan
Trial Attorney, Criminal Division