IN THE UNITED STATES DISTRICT COURT FOR THE
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 3:19CR178-HEH |
| v. | ) | |
| | ) | **Sentencing date: November 13, 2020** |
| STUART J. ANDERSON | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR DOWNWARD VARIANCE
## AND INCORPORATED MEMORANDUM

Stuart J. Anderson, through counsel, and pursuant to this Court's order of January 13, 2020,

respectfully moves for a downward variance at sentencing. In support of his motion, Mr. Anderson

states as follows:

### INTRODUCTION

Mr. Anderson, a 52-year-old man who worked hard to become an attorney and has no

record of criminal convictions prior to this case, now stands before this Court for sentencing. He

is remorseful for his conduct, stating that "I failed innocent investors who were directly harmed

by this criminal advance fee scheme. I also failed my professional, my own personal principles,

and my family." Ex. 1, Letter of S. Anderson at 2. ████████████████████████

████████████████████████████████████████████████████████

██████████████

Mr. Anderson understands that it is this Court's responsibility to impose a just sentence.

We respectfully submit, however, that not every just sentence must entail a term of incarceration.

In this case, there are strong reasons to impose a sentence of supervised probation with a period of

home confinement. These reasons include Mr. Anderson's otherwise law-abiding life and his good

character, his motives for participating in the offense, his limited role in the offense, and the

substantial collateral consequences of the conviction which include the loss of his ability to practice law.  In light of these and other 18 U.S.C. § 3553(a) factors, a sentence of five years' supervised probation, with 30 months of home incarceration is sufficient, but not greater than necessary, to achieve the objectives of sentencing.

## FACTUAL BACKGROUND

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (internal citation omitted). We therefore begin by discussing Mr. Anderson's background and his offense.

### a. Mr. Anderson's childhood and adolescent years.

Mr. Anderson was born in 1967.  At the time, his father, Jay Anderson, was serving in the U.S. Air Force and was stationed in Peshawar, Pakistan.  The family returned to the United States when Mr. Anderson was two and a half years old, and Jay Anderson went to work for the National Security Agency ("NSA").  Shortly thereafter, Mr. Anderson's parents separated and Jay Anderson remarried.  Due to his mother's financial struggles at the time, Mr. Anderson was sent to live with his father and his step-mother, Roseanne, in Maryland when he was about four years old.

Due to the demands of his father's career, Mr. Anderson did not get to spend a significant amount of time with him.  Ex. 2, Report of Dr. M. O'Connell, at 2-3.[1]  Mr. Anderson was mostly looked after by his stepmother, █████████████████████████████████████████

████████████████████████   *Id*.; Ex. 4 at 1, Letter of A. Rubio.[2]  Mr. Anderson developed a

---

[1]   In preparation for sentencing, Dr. Michael O'Connell conducted a psychosocial evaluation of Mr. Anderson. Dr. O'Connell is a Forensic Psychologist. Ex. 3, CV of Dr. M. O'Connell.

[2]   Anne Rubio is Mr. Anderson's life partner.

close bond with his younger brother but struggled to cope with his parents' divorce and his rejection by Roseanne. Ex. 4 at 1; Ex. 5, Letter of J. Anderson at 1. As noted in the PSR, Mr. Anderson tried alcohol at the astonishingly young age of four or five years old.  PSR ¶ 59.

Mr. Anderson respected his father, and even at a young age knew that he did important work for the United States. Ex. 1.  He looked forward to the day when they could develop a closer relationship and spend more time together. Ex. 5 at 1, Ex. 6, Letter of C. Smith at 1. Tragically, that day never came.  On February 10, 1978— the day before Mr. Anderson's 11th birthday—Jay Anderson was killed in a car accident.  This was a severe blow to Mr. Anderson, but it was not the only one.  It was soon followed by Mr. Anderson's separation from his younger brother, when Mr. Anderson moved to live with other relatives following his father's death.  Ex. 2 at 3; Ex. 4 at 1. Jeff Anderson, who now also works for the NSA, writes that

> Stuart is my bigger brother and as a child, I followed him everywhere and wanted to do everything he did.  We were inseparable and I adored him.  Our father's death caused him to be taken from our family home and he went to live with other family members and his mother after that.  As traumatizing as it was to me, I think for him it was even worse as I was five and he was around 11.  Our core family was torn apart.  We kept in touch, but it was sporadic and infrequent until we were young adults.

Ex. 5 at 1.

After living with relatives for a period of time, Mr. Anderson eventually moved to Virginia. Mr. Anderson's mother struggled to make ends meet, and the family moved frequently from place to place.  She worked long hours as a hairdresser, while at the same time trying to rebuild her own life.  As a result, Mr. Anderson was frequently alone, and he noted to Dr. O'Connell that there was a "lack of cohesion with his family which was starkly different from what he observed with some of his friend's families." Ex. 2 at 2.   During his teenage years, Mr. Anderson sought acceptance from his peers and "was heavily influenced by his surroundings, which included, at the age of 14,

living mostly unsupervised among peers who were more focused on drugs and alcohol than working toward achieving conventional goals."  Ex. 2 at 3.

Still dealing with the upheaval in his life from the loss of his father and the separation from his younger brother, Mr. Anderson found himself emotionally adrift.  He lacked motivation and guidance during his teenage years, and he struggled in school.  Ex. 2 at 4.  Yet, despite these challenges, as he entered adulthood Mr. Anderson decided to pursue higher education in order to build a better life for himself.

### b.  Mr. Anderson's education.

In the years that followed his graduation from high school, Mr. Anderson worked his way up from community college, to a four-year college, and then to law school.

After attending community college in Virginia for one year, Mr. Anderson's mother asked him to move out of the home.  Ex. 4 at 2.  He moved to California and enrolled in Southwestern Community College.  Next, Mr. Anderson transferred to San Diego State University and pursued a major in political science and a minor in history.  Throughout this time, Mr. Anderson supported himself financially by working at restaurants.  After graduating from college, Mr. Anderson obtained a paralegal certification and worked for a personal injury lawyer.  In 1995, Mr. Anderson was accepted to University of San Diego Law School, and entered the evening program.  In order to support himself through law school, Mr. Anderson continued to work as a waiter, while also clerking for various law firms.  During school, Mr. Anderson also got practical experience working in the DA's office Victim-Witness Unit and doing *pro bono* work in the community.  Mr. Anderson graduated from law school and passed the bar exam in 2001, on his second attempt.

Jeff Anderson writes in his letter about Mr. Anderson's persistence and self-reliance:

[Stuart] is a hard-working person, he put himself through law school with little to no steady family support at that time.

***

As a professional, Stu has always been driven by his need to provide for himself and have a better life than what he had growing up.  We both came from very humble beginnings.  However, our lives are contrasted by Stuart's overall lack of stability and support.  I personally have not only had the stability and support growing up, I have worked at the same job for the government since I was 19.  It is the same agency (NSA) our father worked for, Stuart's uncle and my mother as well.

Ex. 5 at 1.

But Mr. Anderson's law school years were also a time of significant stress. Mr. Anderson struggled with the pressure of working multiple jobs to make ends meet while he attended law school.  Ex. 4 at 2.  He saw his student loan debt accumulating rapidly, and he struggled academically.  Ms. Rubio recalls a time when she visited Mr. Anderson while he was in law school, and Mr. Anderson needed medical attention but could not afford to see a doctor.  *Id*. at 2. Eventually, her mother helped Mr. Anderson by providing him money to get medical attention. *Id*.  Yet, despite these hardships, Ms. Rubio also witnessed Mr. Anderson's "dedication to persistently meet deadlines, managing anxiety of LSATs/law school tests/CA Bar, his ability to work under pressure at school and home and finding time for his passion to help people through volunteer work."  *Id*. at 2.

After graduating from law school and passing the California bar exam, Mr. Anderson lacked a clear direction in his career.  At the same time, he felt significant pressure to "make it," professionally and financially, in order to get out from under the massive financial obligation of his student loans, which now amounted to more than $300,000. Ex. 2 at 4; Ex. 4 at 2.  In retrospect, it is obvious that it unwise to incur such massive debt with no concrete prospects to pay it off, but Mr. Anderson was determined to achieve his goal of becoming an attorney. As Dr. O'Connell notes, "[i]n my opinion, in addition to getting basic guidance during early stages of life (e.g., avoid excessive debt), in order to address some of the challenges of balancing work and family and made

5

adaptive decisions, Mr. Anderson, whose personality has some dependent features would have greatly benefited from a mentor." Ex. 2 at 11.

### c. Mr. Anderson's professional endeavors.

After passing the bar exam in 2001, Mr. Anderson worked for several years at two different law firms. In 2004, Mr. Anderson decided to strike out on his own. During this time, Anne Rubio had a job in marketing that provided a stable income and gave Mr. Anderson the opportunity to pursue his own business ventures. Mr. Anderson obtained his real estate license, and the following year started Mountain Oak Real Estate. When this did not work out, he worked as a real estate agent for Century 21 Professionals. In 2009, Mr. Anderson formed a law firm, Bauer Anderson LLP, but after several years that business closed due to conflicts between Mr. Anderson and his partner. Ms. Rubio recalled the situation to Dr. O'Connell as follows:

> [Ms. Rubio] recalled that when [Mr. Anderson] attempted to start a law firm, his partner stated she would refer him business as long as they used his credit to buy needed office equipment (e.g., computers). Ms. Rubio stated that Mr. Anderson did not receive any referrals, the company ended up folding and he got "stuck" with office equipment.

Ex. 2 at 8-9. Ms. Rubio attributed Mr. Anderson's failure to succeed in his business dealings to two factors: "low self esteem coupled with his constant need for acceptance has placed him at risk for being manipulated by others," and "marked difficulties accurately perceiving the trustworthiness of others." Ex. 2 at 8. In both her interview with Dr. O'Connell, as well as her letter to the Court, Ms. Rubio recounted several examples of how these traits have impacted Mr. Anderson's judgement in both business matters and personal relationships. Ex. 4 at 4. These included Mr. Anderson's gullibility in relation to a pyramid scheme when he was 28 years old, his abandonment by those his considered his "best friends" when he badly needed their help, and his failure to be cautious and protect himself financially when he started his law firm and other business ventures. *Id*.; Ex. 2 at 6. Ms. Rubio stated to Dr. O'Connell that while "Mr. Anderson

always wanted to be a successful businessman/attorney and be able to care of her and their son . . . he started multiple projects though none ever really succeeded." *Id*. at 9.

During the years that followed the failure of Mr. Anderson's law firm, Mr. Anderson formed or partnered in various private lending/investment companies. As with Mr. Anderson's other business ventures, these businesses ultimately failed or never got off the ground. By 2014, when he was presented with the opportunity to work as an escrow agent for Chimera, Mr. Anderson felt mounting pressure to find profitable work that would allow him to support his family. Ex. 1 at 1. The failure of his prior businesses, combined with personal circumstances that are discussed in detail below, would ultimately be major factors in Mr. Anderson's decision to continue working with Chimera even after it became clear that this was a fraud scheme.

### d.  Mr. Anderson's role as a father, life partner, and friend.

Mr. Anderson met Anne Rubio in 1995 through a mutual friend. Later that year, just as Mr. Anderson was starting law school, Ms. Rubio took a job in New Jersey. Despite this, the relationship endured and Ms. Rubio moved back to California in 2000.

In 2009, Ms. Rubio and Mr. Anderson had a son, A█████. From the very first moment of his son's life, Mr. Anderson has been a "very committed, caring, and reliable father." Ex. 2 at 9; *See also* Ex. 5 at 2 ("[A█████] is highly intelligent, extremely kind, and very energetic. He loves his father tremendously and looks up to him in every way."); Ex. 7, Letter of Dr. S. Anderson at 2 ("After the birth of A█, his son, Stuart blossomed into one of the most amazing fathers I've ever known. Stuart has been such a nurturer to his son from the beginning, as well as a role model highly involved in A█.'s life."); Ex. 5 at 2 (describing Mr. Anderson as a "terrific father").

Mr. Anderson has been completely committed to providing his son with the attention and guidance that he lacked in his own upbringing, taking an active role in virtually every aspect of his

son's life.  *See* Ex. 2 at 9 (noting that when A███ was learning about the Catholic Church, Mr. Anderson converted to Catholicism and became a devoted member of the church, also volunteering as a youth minister); Ex. 7 at 2 ("Stuart's fatherhood has taken on a whole new journey in his life, one that is probably the most enriching pathway so far.  Stuart exposes A█. to the beauty of nature, martial arts, religion, sports, and his love of history.  Stuart is always involved in his day to day academic rigor.  Stuart is truly a natural and is a huge part of his child's world."); Ex. 8 Letter of C. Lamb ("He volunteers at his son's elementary school, soccer league, and is also involved with the teen youth group at his church"); Ex. 9, Letter of K. Meisner (describing Mr. Anderson's involvement with his son's religious journey).

Mr. Anderson has also been a devoted partner to Ms. Rubio for over 25 years.  As Ms. Rubio discusses in her letter, Mr. Anderson was completely committed to A███'s care when he was born with medical complications.  Ex. 4 at 3; Ex. 2 at 6.  Mr. Anderson stepped up again in 2012, when ███████████████████████████ ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████ ████████ ██████████████

█████████████████████████████████████████████████████

██████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



But Mr. Anderson's kindness and generosity have not been limited to those in his nuclear family.  Craig Smith, a cousin of Mr. Anderson, recounts how Mr. Anderson offered him a place to live and helped him during a tough time in his life, and that Mr. Anderson provided him *pro bono* legal assistance.  Ex. 5 at 2. Mr. Anderson helped another friend, Andrea Patton, through a difficult personal time when her son was ill, and her marriage ended.  Ex. 14, Letter of A. Patton. Mr. Anderson's maternal aunt, Patricia Smith, notes that Mr. Anderson helped her set up her own business for free. Ex. 15, Letter of P. Smith at 2. Mr. Anderson's neighbor and friend, Kristopher

Meisner, writes that Mr. Anderson "has shown nothing but devotion and love to my family and has always been there for us no matter what. Stuart is a very giving and compassionate person. He is the type of man that would give you the shirt off his back if you needed it." Ex. 9. Sue Bringhurst, at student at the Tai Chi studio where Mr. Anderson practices and volunteers as an instructor, describes an instance in which Mr. Anderson's support and encouragement gave her the courage to participate in a performance—an act of kindness that she still remembers, five years later. Ex. 16, Ex. Letter of S. Bringhurst at 1. Another instructor at the Tai Chi studio writes that Mr. Anderson is "is the first to always step in to help others giving freely of his time and attention without any pay to himself. He donates his time several days per week and has been for nearly eight years without any sign of slowing. His personality and caring for others are felt by all and he is a respected leader to all those he comes in contact with." Ex. 17, Letter of P. McIntyre at 2. A former colleague writes that Mr. Anderson stepped in to address workplace harassment. Ex. 18, Letter of T. Silva.

Mr. Anderson's offense conduct is completely out of step with his character as a fundamentally kind and caring person.

### e. Mr. Anderson's offense and its consequences.

Mr. Anderson acknowledges that his offense is serious, and that his actions contributed to significant losses to the victims of the scheme. He is remorseful for his participation, writing to the Court that "I failed the victims who had invested their money in good faith. To the victim investors who I failed to respect, I am very sorry. I regret my actions and will never make the same mistake again." Ex. 1 at 2.

The statement of facts accurately recounts Mr. Anderson's offense, and neither Mr. Anderson, nor undersigned counsel, will attempt to minimize the harm it caused. In addition to these facts, however, the following circumstances are important to understanding Mr. Anderson's

recruitment into Chimera, his role in the scheme, and the pressures and motivations that ultimately led him to continue his involvement even after it became clear that Chimera was a fraud scheme.

Mr. Anderson first met Brian Michael Bridge when trying to get funding for a project that Mr. Anderson's company, Citywide Lending, was financing.  Mr. Anderson was introduced to Bridge through brokers who worked with Citywide.  At the time, Mr. Anderson was not successful in obtaining funding from Bridge.  A few years later, in 2014, Mr. Anderson again spoke with Bridge about funding.  During that call, Bridge again declined to provide funding, but the two discussed the opportunity for Mr. Anderson to work in Bridge's company, Chimera Ltd.,[3] as an escrow attorney.  In subsequent phone calls, Mr. Anderson was introduced to Michael Johnson, Jay Smith and others.

Neither Bridge, nor any of Bridge's colleagues, informed Mr. Anderson in these conversations that Chimera was actually a fraud scheme.  Statement of Facts, ECF 12 at 7-8.  Like Chimera's many investors, Mr. Anderson was initially impressed with Bridge and his company.  Given his circumstances at the time—his business was struggling and bringing in no income—Mr. Anderson jumped at the opportunity.  It truly seemed to be a lifeline.  Mr. Anderson began working with Bridge and Chimera in the summer of 2014.  In that capacity, he established an escrow account through which he primarily received payments from investors in Chimera, and disbursed payments in accordance with the instructions of Bridge and others.  However, while Mr. Anderson never became aware of many of the details of the scheme, it became apparent to him that investor funds were being diverted, and that investors were not being paid back as promised.  *Id.*

Mr. Anderson's decision to continue working with Chimera after he learned that it was a vehicle for fraud is completely at odds with the way he had lived his life for 45 years up to that

---

[3]     Ion Holdings was a subsidiary of Chimera, of which Bridge was also principal.

point—as a person described by friends and family members as "compassionate," "giving," and "kindhearted." Ex. 9. Ironically, Mr. Anderson's horribly misguided decision to stay in the scheme was driven by his sense of responsibility to his family. In his letter, Mr. Anderson describes his circumstances and the pressure that he felt to succeed in the time period leading up to his involvement with Chimera in 2014:

> ████████████████████████████████████████
> ████████████████████████████████████████
> ██████ It became painfully clear that my failure in business was not just a professional failure. I was failing my family. I knew that I had to step up for my son and for Anne.

Ex. 1 at 2.

After initially finding a measure of the financial stability that he felt such pressure to attain, and seeing the potential for future work with Chimera, Mr. Anderson found it hard to let go of all of this and once again accept failure. As he explains,

> I allowed my fear of failure to overcome what I clearly knew was my sense of right and wrong. I lied to myself, saying that it would all somehow work out. I compromised my oath and my duty as an attorney. I was too caught up in my need to finally succeed and earn money to make the obvious, moral, and legal choice. It was my duty to obey the law and I failed.

Ex. 1 at 1. In his evaluation of Mr. Anderson, Dr. O'Connell found these pressures significant, writing that

> In terms of situational factors, at the time of the offense, which is said to have started in 2014, Mr. Anderson was experiencing decreases in self-worth and identity issues. He was in significant debt. Financially, he was desperate to make money and psychologically, he was desperate to achieve some sort of success that would enable him to provide financial security to his family. The pressure he experienced to make money was enhanced ██████ ██████████████████████████████████████ the birth of his son.
>
> ***
>
> It also appeared that in the initial stages of his work, Mr. Anderson began to feel increases in self-worth, financial stability and an ability to provide for his family. Following a path whereby the wrongfulness of the group's actions becomes increasingly evident, Mr.

Anderson appeared to develop a tolerance to behavior that if presented initially, he would have likely rejected.

Ex. 2 at 11-12.

The driving force behind Mr. Anderson's participation in the offense was not greed or venality. Instead, Mr. Anderson's motivation was to succeed where he had previously failed: to provide financially for his family. Sadly, Mr. Anderson's actions in this case have had just the opposite result, bringing his family not only uncertainty about the future but public humiliation as well.

Given the close relationship Mr. Anderson has with his son, Mr. Anderson's prosecution and the looming prospect of his incarceration have been a painful reality for A███. Anne Rubio writes that "[r]ecently, we have begun to experience the anger/aggression outbursts from A███. He is deeply stressed and fearful about his father's potential absence." Ex. 4 at 5. *See also* Ex. 19, Letter of C. Anderson ("[A███ loves his father tremendously and looks up to him in every way. This experience is a shock to him and physical separation from his father would be detrimental to his growth."); Ex. 5 at 1 ("A███ is highly intelligent and looks up to his father. A███ and Stu are rarely apart, and Stuart being sentenced to incarceration would be detrimental to A███'s life.")

Mr. Anderson has also let down Ms. Rubio. Instead of stepping up for the family, Mr. Anderson's offense and conviction have been financially and emotionally devastating. "[Stuart's] current situation has left him without any licenses to financially provide . . . His misjudgment has not only affected victims but has had a rippling affect grossly impacting his entire family." Ex. 4 at 5.

Mr. Anderson, in turn, has also been deeply impacted by the embarrassment and pain he has caused to those closest to him, and feels a deep sense of shame for his actions:

Letting down my son and Anne has been incredibly painful. My actions have been a major embarrassment to my family. My late father was in the National Security Agency (NSA). My uncle is retired NSA. My brother currently works for the NSA. My law school roommate and friend is a FBI Special Agent and another became a US Attorney. My other law school friend is counsel for the FBI. My sister-in-law is a Chicago police officer. My cousin is a Correction Officer. I have numerous friends and acquaintances who are active attorneys. I have failed them all, and I am ashamed beyond words.

Ex. 1 at 2. Jeff Anderson, writes in his letter that

[Stuart] has been personally distraught at having been associated with causing victims. Victimizing anyone is not in his character. He is well aware and deeply saddened that his poor judgment has led to people losing money, and in addition, has also negatively impacts all family and friends. Losing the honor of all his professional licenses he worked so many hard years to obtain, has been personally and professionally devastating to Stu and his family.

More than anything, Stu losing the ability to provide for his child and family is one of the most devastating reality of this.

Ex. 3 at 2.

Mr. Anderson understands that he has committed a serious crime, and that a serious crime has serious consequences. He understands that, at a minimum, he will forever be branded a felon and face serious challenges in the future when seeking any type of professional employment. Nevertheless, Mr. Anderson is fortunate to have the love and support of those closest to him and he is committed to working to correct his mistake. As Ms. Rubio states in her letter, "I know that Stuart is determined to make the situation right. He is determined to find a new path to help the victims in any way needed including losses, and to get his life corrected. It is because of this determination to right the wrong that I stand behind Stuart." Ex. 4 at 5.

Mr. Anderson remains hopeful that he can overcome the handicaps of a felony conviction through hard work, and we respectfully submit that a measured and considered response from this Court will allow Mr. Anderson to take steps towards his rehabilitation, be there for his family, and begin to pay off his restitution. Mr. Anderson has received valuable input from Dr. O'Connell

about the treatment and counseling that will help him to cope with stress and make better decisions

in the future. ███████████████████████████████████████████████

████████████████████████████

  █ ██████████████████████████████

   ██████████████████████████████████████████████

███████████████████████████  ██████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████  ████████████████████

█████████████████████████████████████████████████████

██████████████████████████████

   █████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████  ████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████

   █████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████

███████████████████

## DISCUSSION

### I.    APPLICABLE LAW.

Federal sentencing is governed by 18 U.S.C. § 3553(a). Section 3553(a) requires the sentencing Court to consider the factors enumerated therein in determining the appropriate sentence, and directs the sentencing court to "impose a sentence *sufficient but not greater than necessary*" to comply with the purposes of sentencing as set forth in the Sentencing Reform Act (emphasis added).

It is well settled that the Federal Sentencing Guidelines are purely advisory, and that a district court may not presume a sentence within the Guidelines to be reasonable. *Gall v. United States*, 552 U.S. 38, 50 (2007). The Court must calculate the applicable Guidelines, but it may not rely solely on the Guidelines range for determining the sentence to be imposed. *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007) (citing *Gall*, 128 S. Ct. at 596-97). Instead, all section 3553 factors must be considered by the Court.

The applicable law for individual sentencing factors will be discussed in greater detail in the individual sections below.

### II.    THE SENTENCING GUIDELINES RECOMMEND AN EXCESSIVE SENTENCE.

As detailed in Mr. Anderson's objections to the sentencing guidelines, Mr. Anderson respectfully submits that the correct offense level is 24. ECF 32. With a criminal history of I, the resulting advisory range is 51-63 months, prior to any reduction pursuant to USSG § 5K1.1. Setting aside issues relating to the technical application of the guidelines, the guidelines in this case result in an excessive advisory sentencing range for three reasons.

16

First, while the loss amount in this case results in a massive 18-point increase in the guidelines, the loss enhancement itself is not empirically based.  Even at its inception, the loss guideline was an anomaly because it was not based on empirical data and sentencing trends, which was the very purpose behind the guidelines themselves.[4]  After promulgating a non-empirical set of guidelines which recommended sentences higher than those historically imposed, the Commission amended the guidelines several times to increase the loss-based enhancement.[5]  These changes were made despite the fact that there was no support for the deterrence theory on which they were putatively based.[6]  For this reason, courts have frequently exercised their discretion to reject the advisory guidelines based on loss.[7]  We do not argue here that loss is entirely irrelevant

---

[4]     *See* Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 FED. SENT'G REP. 19, 19 (2013) ("the Commission intentionally crafted the initial set of guidelines to require more severe punishment, and more frequent use of imprisonment, than had historically been the case for typical white-collar offenses.") (footnotes omitted); Jeffery S. Parker & Michael K. Block, *The Sentencing Commission, P.M. (Post-Mistretta): Sunshine or Sunset?*, 27 AM. CRIM. L. REV. 289, 319 (1989) (discussing the enactment of the fraud guidelines and the abandonment of the use of data and national experience).

[5]     Frank O. Bowman III, *The Failure of the Federal Sentencing Guidelines: A Structural Analysis*, 105 COLUM. L. REV. 1315, 1319-20 (2005) (explaining that the fraud guidelines were amended in a "one-way upward ratchet increasingly divorced from considerations of sound public policy and even from the commonsense judgments of frontline sentencing professionals who apply the rules.").

[6]     *United States v. Adelson*,  F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts*, 69 (1998)) ("[Be]cause of their arithmetic approach and also in an effort to appear 'objective,' [the Guidelines] tend to place great weight on putatively measurable quantities, such . . . [the] amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.").

[7]     *See, e.g.*, *United States v. Gupta* 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (imposing a sentence of 24 months imprisonment in insider trading case where Guidelines range was 78-97 months, based on inadequacy of fraud Guidelines); *Adelson*, 441 F. Supp. 2d at 509 (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]"); *see also United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004); *United States v. Brothers Construction Co.*, 219 F.3d 300, 319 (4th Cir. 2000) (pre-*Kimbrough* case upholding substantial downward departure despite high loss amount, finding that "the guideline [loss] amount overstated the seriousness of [that co-defendant's] individual conduct.").

in terms of the scope and seriousness of the offense—instead, we ask this Court to note that the loss amount plays an outsize role in the sentencing calculation.[8]

Second, to the extent that the loss amount already reflects the magnitude and scale of the offense, an additional 2-point enhancement for the number of victims presents an overlapping increase that is duplicative of loss, and thus cumulative. The Sentencing Commission acknowledged that "as more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing* 137 (Nov. 2004).[9] And although the Commission itself has failed to remedy the problem of "factor creep," an increasing number of courts have declined to sentence within guideline ranges that are the product of overlapping specific offense characteristics. *See, e.g., United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (subsequently vacated in light of *Booker*) (upholding departure to mitigate effect of "substantially overlapping enhancements" at the high end of the fraud sentencing table); *see also United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (declining to impose a within-Guidelines sentence in a securities fraud case due to, among other factors, the cumulative effect of multiple enhancements "for which the guidelines have frequently been criticized") (internal quotation marks and citation omitted); *Adelson*, 441 F. Supp. 2d at 515.

The *Adelson* court, for example, characterized § 2B1.1's overlapping enhancements as an irrational "'piling- on' of points," and criticized the Commission for failing to explain "the

---

[8]     By contrast, if Mr. Anderson received an enhancement based on his gain rather than the dollar amount of the funds moving the his account, the offense level would only be increased by 12, instead of 18 points. The loss amount thus produces a significant increase based on a somewhat arbitrary metric.

[9]     https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects- and-surveys/miscellaneous/15-year-study/chap5.pdf (visited June 15, 2020).

rationale underlying any of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weight it has chosen to assign to each identified characteristic." *Id.* at 510 (emphasis in original; internal quotation omitted).  To take a basic example, if this offense involved the exact same total loss amount but instead involved 9 victims, Mr. Anderson's advisory range would not increase by two points.[10]

Finally, this case is outside the "heartland" of typical cases because the Commission did not consider the COVID-19 pandemic in formulating the guidelines. COVID-19 is a special and unusual consideration that justifies a downward variance.  For these reasons, as well as the § 3553(a) factors we will now address, Mr. Anderson respectfully submits that a within-guidelines sentence would be excessive.

## III.    THE SECTION 3553(a) FACTORS SUPPORT A DOWNWARD VARIANCE.

Regardless of the applicable sentencing guidelines range, this Court is required to consider all 18 U.S.C. § 3553(a) factors in arriving at a sentence that is "sufficient, but not greater than necessary."   As the following discussion will show, the § 3553(a) factors amply support a downward variance.

### A.  The History and Characteristics of Mr. Anderson.

Mr. Anderson's history and characteristics present significant reasons to impose a downward variance.  First, despite the difficulties of his own childhood, Mr. Anderson has been a loving, supportive and engaged father and husband.  These relationships provide Mr. Anderson with the strongest of motivations never to violate the law again.  Courts have recognized that a defendant's devotion to his family is a factor to consider in favor of a downward variance.  *See, e.g.*, *Pauley*, 511 F.3d 468 (where defendant faced an advisory guidelines range of 78-97 months,

---

[10]      Thus, even assuming the government's position that minor role does not apply is correct, the advisory sentence would be 12-15 months lower than it is with the enhancement.

court's downward variance to 42 months affirmed in part because defendant "is a good parent" which is a "valid consideration under § 3553(a)"); *United States v. Diambrosio*, No. CRIM. A. 04-66, 2008 WL 732031, at *3 (E.D. Pa. Mar. 13, 2008) (basing downward variance from advisory 46-57 months to five years' probation based, in part, on the defendant's devotion to his children and family members). Given the impact of the COVID-19 pandemic, Mr. Anderson's family now needs him more than ever. Ex. 4 at 3. The Court can and should factor Mr. Anderson's record as a devoted father and partner, as well as his family's future needs in determining the appropriate sentence.

In turn, the fact that Mr. Anderson has significant support from his family and others is also a factor that weighs in favor of a downward variance. *See, e.g., United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (family support one of several valid grounds for downward variance from 41-51 months to probation); *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (family support one of three valid reasons for 91-month downward variance); *United States v. Parker*, 2011 WL 6013073, at *2-3 (D.N.M. Nov. 23, 2011) (citing that Parker has a "supportive family structure" in granting a 1-level downward variance); *United States v. Cernik*, 07-20215, 2008 WL 2940854, at *6, 10 (E.D. Mich. July 25, 2008) (noting that "defendant has a solid support structure in his family" in imposing a non-guidelines probation sentence from 46-57 months).

Mr. Anderson's history of good works is a reflection of his character, and must also be considered in imposing sentence, according to § 3553(a)(1) and § 3661. The Court has broad discretion to take account of such good works, whether exceptional or non-exceptional, and whether personal or public in nature. *United States v. Thurston*, 544 F.3d 22, 25-26 (1st Cir. 2008) (upholding downward variance from advisory range of 63-78 months to three months of incarceration followed by 24 months of supervised release, in part based on defendant's "charitable

work, community service, generosity with time, and spiritual support and assistance to others."); *see also United States v. Serafini,* 233 F.3d 758 (3d Cir. 2000) (upholding a downward departure to an individual who encouraged a young man to attend college and loaned him money); *United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005) (upholding a downward departure for defendant's good works that were personal in nature).

A defendant's capacity to work hard and maintain a record of continued employment has also been recognized as a basis for a downward variance. *See, e.g., United States v. Ruff*, 535 F.3d 999, 1001 (9th Cir. 2008*); United States v. Tomko*, 562 F.3d 558, 570-72 (3rd Cir. 2009). Although Mr. Anderson has not found significant success in his business endeavors, as noted by Anne Rubio, Jeff Anderson, and others, Mr. Anderson has consistently worked hard to succeed and maintained employment.  And while Mr. Anderson will no longer be able to work as an attorney, his education and his capacity to work hard will serve as an asset.  *See, e.g*., *United States v. Harry*, 816 F.3d 1268, 1284 (10th Cir. 2016) (stating that factors such as defendant's education and skills supported downward variance); *United States v. Miller*, 2007 U.S. Dist. LEXIS 14716 at * 17 (D. Kan. 2007) (granting downward variance because defendant "appears to be an intelligent individual with some educational attainments.").

Finally, Mr. Anderson's lack of any prior criminal history is a significant factor that favors a downward variance.  *See, e.g*., *Harry*, 816 F.3d at 1284 (relying in part on defendant's lack of criminal history in support of a downward variance); *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) (affirming that district court's downward variance of 60 to 79 months from the guidelines' range was reasonable and permissibly took into account the defendant's lack of a criminal record); *United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (affirming probationary sentence and temporary home confinement for wire fraud despite an 18-24 month guideline range,

where appellate court construed district court to have termed the offense an "isolated mistake" in the context of defendant's otherwise long and entirely upstanding life).

For all of these reasons, Mr. Anderson's personal history and characteristics weigh strongly in favor of a downward variance.

### B. The facts and circumstances of the offense.

While again acknowledging the seriousness of the offense, we respectfully ask this Court to consider Mr. Anderson's motive, which was to support his family financially. This is an important consideration for purposes of § 3553(a). *See, e.g., Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993) ("The defendant's motive for committing the offense is one important factor [in determining the sentence]"); *See also* 1 W. LeFave & A. Scott, Substantive Criminal Law § 3.6(b), p. 324 (1986) ("Motives are most relevant when the trial judge sets the defendant's sentence, and it is not uncommon for a defendant to receive a minimum sentence because he was acting with good motives, or a rather high sentence because of his bad motives").

Additionally, Mr. Anderson's limited role in the scheme, and the fact that he acted on instructions from Bridge and others is likewise a relevant consideration in terms of culpability. These issues have been addressed in detail in Mr. Anderson's objection to the guidelines calculation with reference to the "minor role" adjustment under USSG § 3B1.2(b). Even if this Court determines that the adjustment does not apply, Mr. Anderson's role is still an appropriate mitigating factor for this Court to consider under § 3553(a).

### C. The need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

Section 3553(a)(2)(A) requires the court to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. In doing so, we ask this Court to consider at sentencing what we already know to be true from human experience: that

punishment (and its deterrent effects) can come in many forms; it does not have to come from incarceration alone. This Court can consider the collateral consequences of Mr. Anderson's conviction as a relevant factor in the "need" for the sentence imposed to reflect a just punishment. *See, e.g.*, *Pauley*, 511 F.3d at 474-75 (in a case involving a conviction for possession of child pornography, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment."). In determining whether a term of incarceration is necessary, we urge the Court to consider *all* of the punitive aspects of Mr. Anderson's conviction.

On a professional level, Mr. Anderson's conviction is nothing short of devastating.  As noted, Mr. Anderson has lost the law license that he worked so long and hard to earn, along with his other professional licenses.  The Fourth Circuit and other courts have recognized this as a substantial punishment in itself.  *Pauley*, 511 F.3d at 474-75; *see also United States v. Stewart*, 590 F.3d 93, 141-142 (2d Cir. 2009) (despite a guidelines range of 78 to 97 months, sentencing the defendant to 20 months' imprisonment in part because the "conviction made it doubtful that the defendant could pursue his career as an academic or translator, and therefore that the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant . . . It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence.") (internal quotation marks omitted); see also *United States v. Nesbeth*, 188 F. Supp. 3d 179, 187 (E.D.N.Y. 2016).

Mr. Anderson has also been marked as a felon for life.  Public prosecution and conviction, in itself, constitutes substantial punishment. *See, e.g., Stewart*, 590 F.3d at 141 ("the need for

further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant")*; United States. v. Smith,* 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive."); *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012) ("Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.").  Mr. Anderson's conviction, and the details of his offense, have been reported and published on the internet.[11] It is a fact of modern life that people turn to the internet to "look up" who they are dealing with, both socially and professionally. This conviction has decimated Mr. Anderson's reputation and will follow him for the rest of his life.

Mr. Anderson will also have to pay restitution in the full amount of victims' losses which will pose a significant financial burden to him, in all likelihood for the remainder of his life. *See Adelson*, 441 F.Supp.2d at 506 (imposing a sentence of 42 months and $50 million in restitution where Guidelines called for life sentence, in part because "Adelson will be making substantial restitution payments for the rest of his life. So far as monetary sanctions are concerned, therefore, the Court did indeed impose a life sentence.").

**D. The need for specific deterrence.**

A term of incarceration is not necessary to achieve specific deterrence.  Mr. Anderson presents virtually no risk of recidivating.  For all male offenders in Criminal History Category I

---

[11]    *See* Richmond Times-Dispatch, *California Man Pleads Guilty in $6.2 Million Worldwide Fraud Scheme Alleged to Have Involved 2 Richmond-Area Men* (January 14, 2020)(https://richmond.com/news/local/crime/california-lawyer-pleads-guilty-in-6-2-million-worldwide-fraud-scheme-alleged-to-have-involved/article_052275d0-381b-5571-9823-cddb045285c3.html); Richmond Times-Dispatch, *Guilty Plea Expected in $6.2 Million Worldwide Investment Fraud Scheme* (January 7, 2020) (https://richmond.com/news/plus/guilty-plea-expected-in-6-2-million-worldwide-investment-fraud-scheme/article_f1426cca-6e61-56e7-b8f4-da3b7fe43340.html).

and in Mr. Anderson's age group (he is 52), the rate of recidivism is only 6.9%.[12] For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For all Category I defendants convicted of fraud, the recidivism rate is just 9.3%, the lowest of any offense category, which is 45% below the rate for all fraud offenders. In sum, for individuals with Mr. Anderson's characteristics, the rate of recidivism is exceedingly low. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at Exh. 9, at 28; Exh. 10, at 29, Exh. 11, at 30 (May 2004).[13]

Courts have held that shorter sentences are sufficient to deter offenders like Mr. Anderson because even short sentences have a significant deterrence impact on first-time offenders. *See, e.g., Adelson*, 441 F. Supp. 2d at 514 ("even relatively short sentences can have a strong deterrent effect on 'white collar' offenders") (citing Richard Frase, *Punishment Purposes*, 58 STAN. L. REV. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White-Collar Criminals?*, 23 S. ILL. U. L. J. 485, 492 (1998)); *Stewart*, 590 F.3d at 141 (the "need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant"); *United States v. Coughlin*, No. 06-20005, 2008 U.S. Dist. LEXIS 11263, at *27 (W.D. Ark. Feb. 1, 2008) (in sentencing of former CEO of Wal-Mart, the Court found that a sentence of probation and home detention was "capable of deterring corporate executives like Coughlin, who cherish their freedom of movement and right to privacy, from engaging in conduct similar to Coughlin's").

---

[12]    Courts recognize that the chances of recidivism decrease with age. *See, e.g., United States v. Hamilton*, 323 F. App'x. 27, 31 (2d Cir. 2009) (finding "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming a below-guideline sentence based on the defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Nellum*, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (granting a variance to a 57-year-old defendant because recidivism drops with age).

[13]    Available at: www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf

**E.  The need to avoid unwarranted sentencing disparities and promote respect for the law.**

Under 18 U.S.C. § 3553(a)(6) the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  We respectfully submit that a logical point of comparison in this case would be recent cases involving individuals who violated the federal laws in relation to their role as attorneys:

*United States v. Timothy Litzenburg*, **No. 3:20-cr-13 (W.D. Va. 2020) and** *United States v. Daniel Kincheloe*, **3:20-cr-00014 (W.D. Va. 2020)**.  Defendants were Virginia lawyers who represented hundreds of plaintiffs in mass tort litigation against a company that manufactured a weed killer called Roundup.  3:20-cr-00014, ECF 9 (statement of facts).  In that capacity, the defendants attempted to carry out an extortion scheme whereby they sought to serve as "consultants" for the company, to be paid $200 million in consulting fees, in exchange for abandoning the representation of the plaintiff-clients due to a putative conflict of their own creation.  *Id.* at 1-2.  In the course of the extortion scheme, Litzenburg made multiple threats by phone, email, and in person to damage the value and reputation of the victim company if the proposed consulting arrangement was not accepted.  *Id.* at 2-3.  The defendants set up a Virginia corporation to receive the extortion payments.  *Id.* at 3.  Kincheloe aided and abetted the threats.  *Id.* at 4.  The defendants were sentenced to **24 months** with one year of supervised release (Litzenburg), and **12 months and one day**, with one year supervised release (Kincheloe).[14]

*United States v. Carla Gaines,* **Case No. 1:19-cr-510 (N.D. Ga. 2020)**.  Defendant Carla Gaines was an attorney, who acted as an escrow agent for the county government.  ECF 1 (indictment); ECF 27 (sentencing memorandum).  The defendant received closing funds from the county but paid only part of the funds to payees, unlawfully taking $337,000 that should have been paid to other parties and using the funds to pay for personal and business expenses.  Gaines then lied to the county government in an effort to cover up her offense.  Gaines was sentenced to **24 months** of incarceration.

*United States v. Nelson Alfaro*, **No. 8:19-cr-388 (M.D. Fl. 2020)**.  Defendant Nelson Alfaro was a criminal defense lawyer practicing in the Middle District of Florida.  Defendant devised a scheme whereby he purchased information from a former client, and charged an existing client $80,000 for Alfaro to manufacture a fraudulent "cooperation agreement" between his current client and the government, falsely claiming that the current client was the one supplying the information. The defendant's scheme involved numerous meetings and communications with federal law enforcement authorities throughout 2017-2019 in order to induce federal prosecutors to file a USSG § 5K1.1 reduction motion based

---

[14]     The docket in Kincheloe's case reflects that he received a reduction under USSG 5K1.1.  It is not clear if Litzenburg received any reduction.

on fraud.  ECF 76 (government sentencing memorandum). Defendant was sentenced to **14 months imprisonment**.

***United States v. Jack Stephen Pursley***, **No.4:18-cr-575 (S.D. Tx. 2020)**.  Defendant was an attorney who "designed and implemented a scheme to transfer the untaxed funds from Southeastern Shipping's business bank account . . . to the United States.  Pursley helped to conceal the movement of funds from the Internal Revenue Service (IRS) by disguising the transfers as stock purchases in United States corporations owned and controlled by Pursley and his client."[15]  "Pursley received more than $4.8 million and a 25% ownership interest in the co-conspirator's ongoing business for his role in the fraudulent scheme.  In 2009 and 2010, Pursley evaded the assessment of and failed to pay the taxes he owed on these payments by, among other means, withdrawing the funds as purported non-taxable loans and returns of capital.  Pursley used the money he garnered from the fraudulent scheme for personal investments, and to purchase personal assets, including a vacation home in Vail, Colorado, and property in Houston, Texas."[16]  Pursley went to trial and was found guilty on all counts.  Pursley was sentenced to a term of **24 months** with two years of supervised release.

***United States v. Clayton Marlow Anderson***, *Jr.*, **3:18-cr-3075 (S.D. Ca. 2018)**.  According to the Southern District of California US Attorney's Office, between 2005 and 2014, Anderson, an attorney, "solicited unsecured loans from six individuals and paid them high rates of interest between 8% and 13% each year.  However, Anderson eventually refashioned these unsecured loans as an 'investment' with guaranteed interest, and pitched the investment to his legal clients."[17]  In addition, after winning an $1.8 million judgment on behalf of a client and paying the client its share of the proceeds, "Anderson repeatedly solicited them . . . promising [the client] a 13% annual return on their 'investment.'"  Anderson admitted in pleading guilty that he made multiple materially false claims to investor-clients and violated his due as an attorney.  The losses Anderson caused to investors totaled to over $1.3 million.  Anderson was sentenced to **18 months** incarceration, followed by three years of supervised release.

Unlike the defendants in the foregoing cases, Mr. Anderson did not devise the scheme or play a leading role in it.  Considering issues such as Mr. Anderson's character, his role in the offense, and how he behaved after his crime, we respectfully submit that a sentence in excess of 24 months of incarceration would present an unwarranted disparity.  However, for the reasons we

---

[15]  *See* USDOJ Press Release, August 6, 2020, at https://www.justice.gov/opa/pr/houston-attorney-sentenced-prison-offshore-tax-evasion-scheme

[16]  *Id*.

[17]  *See USDOJ Press Release*, November 9, 2018, at https://www.justice.gov/usao-sdca/pr/disbarred-attorney-sentenced-prison-defrauding-former-clients-and-investors

will discuss more fully below, given the COVID-19 pandemic and the particular danger it poses in prisons, there are compelling reasons to impose a sentence of home confinement.

The proposed sentence would also be consistent with other sentences imposed in this district for comparable conduct. *See, e.g., United States v. Boone,* 2:16-cr-00126 (E.D. Va. 2017) (sentencing defendant who pleaded guilty to bank fraud and honest services fraud to a term of three years' probation with 12 months of home confinement, despite guidelines range of 37 to 46 months); *United States v. McPhun*, 1:18-cr-333 (E.D. Va. 2018) (sentencing defendant to 24 months of supervised probation for wire fraud in which defendant fraudulently secured a $100,000 investment).

### F.  The need for treatment.

As indicated in Dr. O'Connell's report, treatment—both for substance abuse and mental health health—would be a substantial benefit to Mr. Anderson.  Mr. Anderson acknowledges that he would benefit from substance abuse treatment and counseling in order to help him find healthy ways of dealing with stress, and making better decisions.  We therefore ask this Court to recommend such treatment as a part of the Mr. Anderson's sentence.

### G.  The kinds of sentences available.

The Court is free to impose any sentence it deems appropriate, even though Mr. Anderson does not fall within Zones A, B or C of the sentencing table. The Court is likewise free to consider punishments such as probation, where some or all of the period of incarceration is served in home or community confinement.

A sentence of home confinement and supervised probation is especially appropriate in this case given the COVID-19 pandemic.  When passing the Sentencing Reform Act of 1984, Congress made clear that alternatives to incarceration are "generally appropriate[e]" for individuals like Mr.

Anderson—a person with no criminal history convicted of a non-violent offense.  28 U.S.C. § 994(j).  But now, a sentence of home confinement and supervised probation is particularly warranted.

As the letter submitted by Ms. Rubio shows, Mr. Anderson serves a critical and foundational role in his family, now more than ever.  Furthermore, there is a strong interest in reducing the prison population during the outbreak of COVID-19, as well as an interest in lessening the risk to individual defendants where there is not a substantial need for specific deterrence and incapacitation.  In addition to issues such as the harsh prison conditions and lack of programming during the pandemic, Mr. Anderson will likely be unable to see his son and Ms. Rubio due to the risks to Ms. Rubio's health.  *See, e.g., United States v. Shehee*, No. 18-cr-06005-SMJ, 2020 WL 5229030, at *3 (E.D. Wash. Sep. 1, 2020) ("Home confinement reflects the seriousness of the offense and provides a more just punishment, because it is safer for Defendant yet still restricts Defendant's liberty."); *United States v. Bakeas,* 987 F. Supp. 44, 50 (D. Mass. 1997) ("[A] downward departure is called for when, as here, an unusual factor makes the conditions of confinement contemplated by the guidelines either impossible to impose or inappropriate.").

The Supreme Court has recognized that supervised release is not merely a slap on the wrist, as it is severely restricting on the probationer. *See Gall v. United States*, 128 S. Ct. 586, 596-98, n.4 (2007) (even a non-custodial sentence imposes serious restrictions on one's liberty and constitutes punishment, is not a "free pass"). The term of home confinement and probation will place significant restrictions on who Mr. Anderson can associate with, where he can travel, what kind of work he does, and other aspects of his life.  He also has a significant amount of restitution to pay and will not be able to make progress on that obligation unless he is in the community.

For all of these reasons, a sentence of five years' probation with the first 30 months to be served in home confinement is warranted in this case.

**CONCLUSION**

For the reasons outlined above, Mr. Anderson respectfully requests that the Court impose a sentence of five years supervised probation, with the first 30 months to be served in home confinement.

Respectfully submitted,

/s/ Eugene Gorokhov
Eugene Gorokhov, VSB # 73582
*Attorney for Defendant*
Burnham & Gorokhov, PLLC
1424 K St. NW, Suite 500
Washington, D.C. 20005
202-386-6920 (Tel)
202-765-2173 (Fax)
eugene@burnhamgorokhov.com

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed through the Court's CM/ECF system, and a copy has been provided to counsel for the government.

/s/ Eugene Gorokhov
Eugene Gorokhov, VSB # 73582
Attorney for Defendant
Burnham & Gorokhov, PLLC
1424 K St. NW, Suite 500
Washington, D.C. 20005
202-386-6920 (Tel)
202-765-2173 (Fax)
eugene@burnhamgorokhov.com